Ronald Dale MARTINEZ, Appellant,

v.

The STATE of Oklahoma, Appellee.

No. A–16000.

Court of Criminal Appeals of Oklahoma.

April 12, 1972.

James R. Cox, Enid, for appellant.

Larry Derryberry, Atty. Gen., Paul Crowe, Asst. Atty. Gen., for appellee.

## OPINION

BRETT, Judge:

Appellant, Ronald Dale Martinez, hereinafter referred to as defendant, was convicted by jury verdict in the District Court of Garfield County, case no. CRF–69–789, with the crime of murder and sentenced to life imprisonment. Judgment and sentence was imposed on September 29, 1969, and this appeal perfected therefrom.

It was charged by information that on May 24, 1969, in Enid Garfield County, Oklahoma, the defendant did intentionally, willingly, and with premeditated design, beat about the head with a steel pipe one William C. Harper, as a result of which, Harper died. The evidence established that on May 29, 1969, in the late afternoon, two young boys, while looking down a laundry chute in an abandoned laundry building, saw a body. The boys summoned the police who found the body on the floor of the laundry basement. The skull of the body had been crushed and battered. It was lying in a pool of blood with blood splattered throughout the basement. Near the body was found a hat soaked in blood, a cigarette lighter, empty wine bottles, and a metal pipe approximately three feet in length which on one end had blood and matted hair. The body was identified as William C. Harper.

On June 1, 1969, pursuant to a tip, three police officers and an assistant district attorney, Norman Lamb, went to the residence of the defendant and requested that he accompany them to the police station. The officers testified that they did not

have a search or arrest warrant for the defendant and that they did not place him under arrest at his residence. Rather, they testified that the defendant voluntarily accompanied them to the police station. Upon arriving at the police station, the defendant was initially advised of his constitutional rights pursuant to the requirements of Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). According to an officer present during the questioning, after some conversation had transpired defendant said, "Do you want me to plead guilty and go to the chair?" The assistant district attorney, Mr. Lamb, then advised defendant that if he would plead guilty he would recommend a sentence of life imprisonment.

Thereafter, the defendant gave a verbal incriminating statement relating that on May 24th, a Saturday night, he had been drinking at a tavern known as Bill's Bar. Defendant related that he was tight and left Bill's Bar for Potter's Service Station to use the restroom. Upon leaving Potter's Service Station the defendant saw a man, described by defendant as a "wino," whom he asked for a drink. Defendant and the man then went to a liquor store where the man purchased some wine. The two then went to a vacant lot and drank for a while, but left that location upon being observed by a passerby and went to the basement of the Old Oklahoma Laundry Building. The two drank with each other in the basement of the building for a while. The man had commented to the defendant that he had plenty of money, having just been paid, and the defendant then asked for some money to purchase more wine. The man refused and defendant started to leave, but as he got up the other man got up quickly behind him. Startled, the defendant picked up a pipe, hit the man in the head several times, left the pipe, and returned to Bill's Bar. During the interrogation the defendant identified a picture of William C. Harper as being the man that he struck. Defendant then wrote out a statement to the same

effect which was admitted into evidence at the trial. In the written statement the defendant stated, "I think he is going to jump me so I get a bar and hit him. Then I lost my head and killed him."

After giving his statement to the officers, the defendant gave his permission, signing a written waiver, for the officers to search his house. Defendant informed the officers what he was wearing on the evening of the crime and these articles were taken from his home for chemical analysis. Later defendant and the officers retraced defendant's steps on the evening of May 24th. Defendant indicated to the officers that after he had hit the deceased he reached over and took his billfold, and that some distance from the basement he had thrown the billfold away. The officers recovered the billfold in two pieces from the approximate location indicated by the defendant.

The cigarette lighter and hat found at the scene of the crime were identified by the deceased's son as being the property of the deceased. Chemical analysis indicated that the hat was saturated in blood, being human type O. The pipe found at the scene also had type O blood on it. Further, the shoes that the defendant was wearing when taken into custody, which defendant stated he was wearing on the evening he hit the deceased, were also splattered with type O blood. It was established that the deceased's blood was type O.

At the trial the defendant testified in his own behalf. Defendant related that he had several prior felony convictions. Regarding the evening of May 24th, the defendant related approximately the same story as given in his verbal and written statement. The defendant testified that he was intoxicated and that the deceased had cussed him. Defendant stated, "I thought he was going to hit me with the wine bottle."

We note that the jury was fully and accurately instructed regarding the law as to murder, manslaughter, excusable homicide,

justifiable homicide, and self-defense. We further observe that the court instructed the jury that voluntary intoxication does not remove criminal responsibility; but that advanced intoxication may prevent the ability of an individual to form the specific intent to kill necessary to convict for murder.

■ The defendant asserts several assignments of error, all of which chiefly concern the defendant's statement and circumstances under which it was obtained. It is defendant's first contention that he was illegally arrested since at the time the officers arrived at his house they did not have probable cause for believing that he had committed a felony. From a review of the testimony at the trial, and the evidence at the motion to suppress, it would appear that the defendant voluntarily went with the police officers on the night of June 1st, without being arrested. But even if defendant had been arrested at his home without probable cause, such "an unlawful arrest does not affect the jurisdiction of the court, nor preclude defendant's trial . . ." Embree v. State, Okl.Cr., 488 P.2d 588, 591 (1971). Defendant makes no claim that evidence was obtained as the result of an illegal arrest. It is clear, as will be explained, that defendant's confession was not the result of an illegal arrest which would render it inadmissible as the fruit of illegality. Rather it was the result of defendant's voluntary and knowing conduct. See Wong Sun v. United States, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). We therefore find defendant's challenge to the arrest to be without merit.

■ It is defendant's second contention that the magistrate at the preliminary examination erred in failing to require a witness to testify when that witness, called by the defendant, refused to testify. It appears that at the preliminary examination the defendant called Norman Lamb, the assistant district attorney who was prosecuting the case, as a witness. Mr. Lamb declined to testify, stating that he was prosecuting the case and that his testimony was not essential. Defense counsel was attempting to question Mr. Lamb regarding the circumstances surrounding the taking of the statement from the defendant, since Mr. Lamb had been present and participated in the interrogation of the defendant. Defendant's point is well taken that at a preliminary examination the defendant is entitled to call and examine all material witnesses. Beaird v. Ramey, Okl. Cr., 456 P.2d 587 (1969). Mr. Lamb, as a participant in the interrogation of the defendant, was a material witness. It would have been best for the examining magistrate to require the assistant district attorney to testify. However, considering that this was a preliminary examination, we do not deem it to be a substantial error which prejudiced the defendant's rights. It is to be remembered that the purpose of a preliminary examination is to determine whether a crime has been committed and if there is reasonable cause to believe the defendant committed said crime. That purpose was satisfied in this case. In finding no error, we are influenced by the fact that Mr. Lamb was only one of several witnesses present at the time that the defendant was interrogated. Thus, his testimony was not unique, and the defendant was not prevented from establishing facts which could not otherwise be obtained. Further Lamb did testify at the hearing on the motion to suppress.

■ It is defendant's further assignment that it was error for the trial court to deny his motion for a continuance on the ground that defendant had not been able to examine some of the witnesses to be called by the State. At his motion for continuance the defendant argued that three of the witnesses, Wanda Hutchings, Mr. Don LaFon and Mrs. Don LaFon, would not discuss the case under the instructions of the district attorney. Defendant argues that the failure of these witnesses to discuss the case with him under the instructions of the district attorney, violated his rights. The Oklahoma Constitution provides that "in capital cases, at least two days before

the case is called for trial, [defendant] shall be furnished with a list of the witnesses that will be called in chief . . . " Article 2, § 20. In Smith v. State, 69 Okl. Cr. 17, 99 P.2d 527, this Court held that the purpose of this constitutional requirement "is to apprise defendant who the witnesses are, where they may be found, and to enable him to investigate their testimony, their character, and credibility. . . . " The State through its prosecuting attorney or other officials may not prevent a witness from discussing the case with the defendant or his counsel; or otherwise thwart this constitutional right of the defendant.

It is a fundamental rule that a motion for continuance rests in the sound discretion of the trial court. Upon fully reviewing the record, we find that the trial court did not abuse its discretion in denying the defendant's motion for continuance based on the grounds that three potential witnesses would not discuss the case with defense counsel. It is clear that defense counsel was furnished with a list of the witnesses and had the opportunity to investigate their character and credibility. Of the three witnesses mentioned in defendant's motion, only one, Wanda Hutchings, was actually called in the trial as a witness. Mrs. Hutchings testified in substance that she had employed the deceased, William C. Harper, and that the paycheck found on the body had been given to the deceased for his work at her establishment. Mrs. Hutchings also testified that the billfold discarded by the defendant had been sold to the deceased by her. After Mrs. Hutchings testified for the State in chief, defense counsel had ample opportunity to cross-examine her. Thus it cannot be said that the defendant was denied his right to confront a witness against him. Furthermore, we are of the opinion that the nature of Mrs. Hutchings' testimony was such that the defendant's inability to discover her testimony prior to trial, could not have materially prejudiced his defense. Accordingly, we conclude

that the trial court did not abuse discretion in overruling defendant's motion for continuance.

It is defendant's contention that the trial court committed error in admitting over objection defendant's confession and testimony concerning same. Defendant's objection to testimony regarding his confession was overruled at the preliminary examination. Defendant subsequently filed a motion to suppress the confession which came on for hearing on September 11, 1969. At the hearing, Norman Lamb, assistant district attorney, Eugene Graham, Enid police officer, James Harding, Garfield County deputy sheriff, and the defendant testified. Lamb testified that he "received information that Ronald Martinez knew who killed Bill Harper," and then decided to "visit" the defendant. According to Lamb, there was no intention to arrest the defendant when Lamb and the officers visited defendant's home on June 1st. Lamb made it clear to the officers that they were not going there for an arrest. Upon arriving at the home of the defendant, Lamb related that he "asked him if he would mind coming to the police station, that I wanted to visit with him." According to Lamb he did not mention to the defendant any particular subject, and the defendant freely agreed to come to the police station. Upon arriving at the police station, Lamb testified he fully detailed defendant's rights as follows:

> "You have a right to remain silent, and, if you do say anything, it can be used against you in a court of law or, as I have heard this court say, it could be used to help you. That you have a right to an attorney, and, if you can't afford an attorney, the court will appoint one at state expense. It won't cost you anything. Then I asked him if he could read and write and asked him how far he had gone in school and asked him if he had understood what I had explained and he said, 'Yes, I do.' "

After advising defendant of his rights, Lamb then inquired if defendant knew any-

thing about the murder of Harper. During the conversation Lamb told the defendant "he could clear his conscience and help himself by telling us about it." Lamb advised the defendant as to the penalty upon conviction for murder. Lamb told the defendant that although the court imposed sentence, Lamb "could recommend and would recommend a life sentence on a plea of guilty." Officer Graham testified at the hearing on defendant's motion and corroborated Lamb's testimony as to circumstances surrounding the confession of defendant.

 From a complete review of the evidence at the hearing on defendant's motion, we cannot agree with defendant's contention that the confession was the result of "coercion and promise of benefit." We find that the evidence amply supported the findings of the trial court that the defendant voluntarily and intelligently waived his right to the presence of counsel. "After an accused has been fully advised of his rights in accord with the requirements of Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694, he may knowingly and intelligently waive the right to counsel, refuse the offer of counsel, and answer questions or make a statement which would be admissible at his trial." Koonce v. State, Okl.Cr., 456 P.2d 549, 551 (1969).

 We further find that the evidence before the trial court amply supported a finding that the defendant's statement and confession was not the result of coercion or a promise of benefit. "A voluntary confession is one made by an accused freely and voluntarily, without duress, fear or compulsion in its inducement, and with full knowledge of the nature and consequences of the confession." Alexander v. State, Okl.Cr., 305 P.2d 572, 575 (1956). Although the defendant may have experienced some degree of fear at the time of his interrogation, as would be normal for any person accused of murder, it cannot be said that the officials threatened the defendant or by their own actions or words coerced or induced the defendant to unwittingly confess to the crime. The district attorney's statement that he would recommend a life sentence if the defendant would plea guilty does not amount to a promise of benefit which would render the confession involuntary. Since the defendant did not enter a plea of guilty, the prosecutor was never in a position to recommend a sentence. Thus, we do not have a broken or unkept promise which would invalidate the plea. We therefore conclude that the evidence supported the findings of the trial court that the defendant intelligently and voluntarily made a confession which was admissible in evidence at defendant's trial.

 It is defendant's final contention that it was error for the magistrate and trial court to admit in evidence over objection the testimony of Officer Graham regarding statements made by Norman Lamb in the presence of the defendant. In support of his proposition, defendant cites Hazlewood v. Oklahoma City, Okl.Cr., 430 P.2d 852 (1967), which held:

"It is improper and a violation of the defendant's constitutional right guaranteed by Article II, § 20 of the Oklahoma Constitution, to be confronted with witnesses appearing against him, for the trial court to admit the testimony of an officer relating statements of a third party tending to incriminate the defendant, made in the presence of the defendant, and particularly is this true when such third party has not testified as a witness in the case and has not been subjected to cross-examination by the accused."

In Hazlewood, the trial court admitted into evidence the testimony of a police officer relating statements made by a witness, Ivan Church, in the presence of the defendant, which statements were admitted against the defendant over his objection and "tended to establish the corpus delicti of the crime for which [defendant] stands convicted." 430 P.2d at 853. In the Hazlewood case the witness Church was never called as a witness to testify, and thus this court held defendant had been denied his constitutional right of confrontation of the witnesses against him.

**422**

We think the facts of the Hazlewood case and the case now at bar are clearly distinguishable. Defendant cites as error the testimony of Officer Graham where he states that "Norman Lamb advised Ronnie Martinez of his rights." Officer Graham's testimony as to what Lamb advised the defendant did not "tend to establish the corpus delicti of the crime." Norman Lamb was not required to testify at the preliminary examination, and although he did not testify at the trial, Mr. Lamb did testify at the hearing on defendant's motion to suppress and was subject to cross-examination by defense counsel. Thus it cannot be said that defendant was denied his right of confrontation.

Therefore, having considered defendant's assignments of error and finding them without merit, we conclude that the judgment and sentence should be, and the same is hereby, affirmed.

BUSSEY, P. J., concurs in result.

SIMMS, J., concurs.